UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

DAVID C.,[1]

                                    Plaintiff              DECISION and ORDER

-vs-                                                       6:23-CV-06510-CJS

COMMISSIONER OF SOCIAL
SECURITY,
                                    Defendant.
_____


## INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final determination

of the Commissioner of Social Security ("Commissioner" or "Defendant") which denied the

application of Plaintiff for Social Security Disability Insurance ("SSDI") benefits.   Plaintiff

maintains that such determination is affected by errors of law and not supported by substantial

evidence.   More specifically, Plaintiff alleges, first, that when assessing the opinions of his

primary physician, Anna Jack, M.D. ("Jack"), the ALJ "failed to address supportability and

consistency and relied on selectively chosen evidence to reject [Jack's] opinion[s] [concerning

his mental impairments.]"[2]   Plaintiff further maintains that the ALJ failed to develop the record

to obtain missing mental-health counseling records from Life Solutions Psychotherapy ("Life

Solutions").[3]   Now before the Court are Plaintiff's motion (ECF No. 6) for judgment on the

pleadings, and Defendant's cross-motion (ECF No. 8) for the same relief.   For reasons

---

[1]  The Court's Standing Order issued on November 18, 2020, indicates in pertinent part that, "[e]ffective immediately, in opinions filed pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), in the United States District Court for the Western District of New York, any non-government party will be identified and referenced solely by first name and last initial."

[2]  Pl. Memo of Law, ECF No. 6-1 at p. 17.

[3]  Pl. Memo of Law, ECF No. 6-1 at p. 25.

discussed below, Plaintiff's application for judgment on the pleadings is denied, Defendant's motion for judgment on the pleadings is granted, and this action is dismissed.

STANDARDS OF LAW

The Commissioner decides applications for disability benefits using a five-step sequential evaluation process:

> A five-step sequential analysis is used to evaluate disability claims. *See* 20 C.F.R. §§ 404.1520, 416.920.  First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a severe impairment[4] which significantly limits his physical or mental ability to do basic work activities.[5] If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in the regulations [or medically equals a listed impairment].  Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity [("RFC")] to perform his past work.[6] Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform. The claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden at step five.[7]

---

[4] "At step two, the ALJ must determine whether the claimant has a 'severe medically determinable physical or mental impairment that meets the duration requirement in [20 C.F.R.] § 404.1509, or a combination of impairments that is severe and meets the duration requirement.' *Id*. If not, the claimant is deemed not disabled, and the inquiry ends." *Koch v. Colvin*, 570 F. App'x 99, 101 (2d Cir. 2014); *see also*, 20 C.F.R. § 404.1520(a)(4)(ii) ("At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.").

[5] The Commissioner's Regulations define basic work-related activities as follows: "Basic work activities. When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs. Examples of these include— (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering simple instructions; (4) Use of judgment; (5) Responding appropriately to supervision, co-workers and usual work situations; and (6) Dealing with changes in a routine work setting."  20 C.F.R. § 404.1522 (West 2023).

[6] Residual functional capacity "is what the claimant can still do despite the limitations imposed by his impairment." *Bushey v. Berryhill*, 739 F. App'x 668, 670–71 (2d Cir. 2018) (citations omitted); *see also*, 1996 WL 374184, Titles II & Xvi: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P (S.S.A. July 2, 1996).

[7] "The Commissioner's burden at step five is to show the existence of possible employment for an individual with the RFC determined by the ALJ in the fourth step of the sequential analysis." *Smith v. Berryhill*, 740 F. App'x 721, 726–27 (2d Cir. 2018) (citation omitted). The ALJ typically does this either by resorting to the medical vocational

*Colvin v. Berryhill*, 734 F. App'x 756, 758 (2d Cir. 2018) (citations and internal quotation marks omitted).

An unsuccessful claimant may bring an action in federal district court to challenge the Commissioner's denial of the disability claim.   In such an action, "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C.A. § 405(g) (West).   Further, Section 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive."

The issue to be determined by the court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *see also, Barnaby v. Berryhill*, 773 F. App'x 642, 643 (2d Cir. 2019) ("[We] will uphold the decision if it is supported by substantial evidence and the correct legal standards were applied.") (citing *Zabala v. Astrue*, 595 F.3d 402, 408 (2d Cir. 2010) and *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012).").

"First, the [c]ourt reviews the Commissioner's decision to determine whether the Commissioner applied the correct legal standard." *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir.

---

"grids" or, where the claimant has a non-exertional impairment, by taking testimony from a vocational expert [("VE")]. *See, Bapp v. Bowen*, 802 F.2d 601, 603 (2d Cir. 1986) ("[T]he mere existence of a nonexertional impairment does not automatically require the production of a vocational expert nor preclude reliance on the guidelines. A more appropriate approach is that when a claimant's nonexertional impairments significantly diminish his ability to work—over and above any incapacity caused solely from exertional limitations—so that he is unable to perform the full range of employment indicated by the medical vocational guidelines, then the Secretary must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform.").

1999); *see also, Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) ("[W]here an error of law has been made that might have affected the disposition of the case, this court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the [administrative law judge] [("]ALJ[)"]. Failure to apply the correct legal standards is grounds for reversal.") (citation omitted).

If the Commissioner applied the correct legal standards, the court next "examines the record to determine if the Commissioner's conclusions are supported by substantial evidence." *Tejada v. Apfel*, 167 F.3d at 773.  Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (citation omitted).

> The substantial evidence standard is a very deferential standard of review—even more so than the 'clearly erroneous' standard, and the Commissioner's findings of fact must be upheld unless a reasonable factfinder would have to conclude otherwise." *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (emphasis in original).

*Banyai v. Berryhill*, 767 F. App'x 176, 177 (2d Cir. 2019), as amended (Apr. 30, 2019) (internal quotation marks omitted); *see also, Snyder v. Comm'r of Soc. Sec.*, No. 22-277-CV, 2023 WL 1943108, at *1 (2d Cir. Feb. 13, 2023) ("While the substantial evidence standard requires we find more than a mere scintilla of support for the Commissioner's decision, it is still a very deferential standard of review requiring us to uphold the Commissioner's findings unless a reasonable factfinder would *have to conclude otherwise*.") (emphasis in original; citations and internal quotation marks omitted); *Schillo v. Kijakazi*, 31 F.4th 64, 69 (2d Cir. 2022) ("We may vacate the agency's disability determination only if it is based on legal error or unsupported by 'substantial evidence'—that is, if no reasonable factfinder could have reached the same

conclusion as the ALJ.").

In applying this standard, a court is not permitted to re-weigh the evidence. *See, Krull v. Colvin*, 669 F. App'x 31, 32 (2d Cir. 2016) ("Krull's disagreement is with the ALJ's weighing of the evidence, but the deferential standard of review prevents us from reweighing it."); *see also, Riordan v. Barnhart*, No. 06 CIV 4773 AKH, 2007 WL 1406649, at *4 (S.D.N.Y. May 8, 2007) ("The court does not engage in a *de novo* determination of whether or not the claimant is disabled, but instead determines whether correct legal standards were applied and whether substantial evidence supports the decision of the Commissioner.") (citations omitted). "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (internal quotation marks omitted). "In other words, this Court must afford the Commissioner's determination considerable deference, and 'may not substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review.'" *Melia v. Colvin*, No. 1:14-CV-00226 MAD, 2015 WL 4041742, at *2 (N.D.N.Y. July 1, 2015) (quoting *Valente v. Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir.1984)).

When considering whether a particular finding or decision is supported by substantial evidence, a court may not rely on *post hoc* rationalizations offered by the Commissioner, but it may consider evidence that was evidently considered by the ALJ even if it was not expressly mentioned in the administrative decision. *See, Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) ("When, as here, the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or

5

have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability. *E.g., Berry v. Schweiker*, 675 F.2d 464, 469 (2d Cir.1982). In *Berry*, we noted that, although we would remand for further findings or a clearer explanation where we could not fathom the ALJ's rationale "in relation to evidence in the record," we would not remand where "we were able to look to other portions of the ALJ's decision and to clearly credible evidence in finding that his determination was supported by substantial evidence." *Id*. *See also Miles v. Harris*, 645 F.2d 122, 124 (2d Cir.1981) ("Notwithstanding the apparent inconsistency between the reports of [two doctors], we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony ...."); *Banyai v. Berryhill*, 767 F. App'x at 177 ("An ALJ is not required to discuss every piece of evidence submitted, and the failure to cite specific evidence does not indicate that such evidence was not considered."); *see also*, *Loni S. v. Comm'r of Soc. Sec.*, No. 3:22-CV-805 (CFH), 2023 WL 4195887, at *19 (N.D.N.Y. June 27, 2023) ("The Court is required to look at the entire ALJ's decision when reviewing for substantial evidence. *See John L. M. v. Kijakazi*, No. 5:21-CV-368 (BKS/TWD), 2022 WL 3500187, at *2 (N.D.N.Y. Aug. 18, 2022) (citations omitted) ('[W]hile a reviewing court may not affirm the Commissioner's decision based on an impermissible *post-hoc* rationalization, it may affirm where the ALJ's consideration of the relevant factors can be gleaned from the ALJ's decision as a whole.').").

## FACTUAL and PROCEDURAL BACKGROUND

The reader is presumed to be familiar with the factual and procedural history of this action, which is set forth in the parties' papers.   The Court will refer to the record only as necessary to rule on the alleged errors identified by Plaintiff.

As set forth in Plaintiff's memo of law, the procedural history of the action is as follows:

[Plaintiff] filed an application for Social Security Disability (Title II) on August 27, 2018, alleging disability beginning May 8, 2018. Tr. 16. The application was denied on December 18, 2018. Tr. 33. Plaintiff timely filed a hearing request on December 27, 2018. Tr. 16. Plaintiff appeared and testified at an administrative hearing before ALJ Brian Lecours, on May 11, 2020, and on September 14, 2020. Tr. 16. Plaintiff was represented by attorney Anthony Demarco. Tr. 16. The ALJ considered the case de novo and issued an unfavorable decision on September 23, 2020, finding Plaintiff not disabled. Tr. 13. Plaintiff timely filed appeals counsel review, but on February 3, 2021, it denied the request. Tr. 1. Plaintiff timely filed a complaint in the United Stated District Court for the Western District of New York, and the parties subsequently stipulated to remand on July 13, 2022. Tr. 1120-21. The Appeals council ordered a new hearing on September 10, 2022. Tr. 1122. Plaintiff then appeared and testified at an administrative hearing before ALJ Lecours, represented by his attorney Remy Militello on May 8, 2023. Tr. 1050. The ALJ considered the case de novo and issued an unfavorable decision on May 19, 2023, finding Plaintiff not disabled. Tr. 1021. Therefore, the ALJ's decision became the Commissioner's final decision.

ECF No. 6-1 at p. 2.   This brief recitation by Plaintiff is accurate as far as it goes, but what it does not mention, and what the Court points out for reasons that will be discussed further below, is that attorneys DeMarco and Millitello, mentioned in the above-quoted passage, are or were at all relevant times members of the same law firm as Plaintiff's attorneys in this action, Ms. Comerford and Mr. Jones. Tr. 1192.   In other words, throughout these entire proceedings, Plaintiff has been represented by attorneys from the Law Offices of Kenneth Hiller, which recently has become Hiller Comerford ("the Hiller Firm").

Plaintiff had sufficient quarters of coverage to remain insured through December 31, 2022. Tr. 1025.   Consequently, the issue before the Commissioner was whether Plaintiff was disabled at any time between the alleged disability onset date, May 8, 2018, and his last-insured date, December 31, 2022. Tr. 10125.

Plaintiff claimed to be disabled due to a combination of physical impairments, including degenerative joint disease of the knees, obstructive sleep apnea, obesity and diabetes, and mental impairments including depression and anxiety. Tr. 1027.  For his physical ailments, Plaintiff received treatment from a variety of doctors, including his primary care physician, Dr. Jack.   For his mental impairments, Plaintiff also received treatment from Jack, and, in addition, from Life Solutions, UR Mental Health, and Easterseals New York ("Easterseals"). Tr. 1028.

The claims in this action challenge the ALJ's evaluation of Plaintiff's alleged-disabling mental impairments, namely, anxiety, depression, low cognitive functioning, and post-traumatic stress disorder ("PTSD").   At the time of the hearing, Plaintiff was 45 years of age, and his education consisted of an IEP high school diploma and vocational training as a security guard. Tr. 464.   Plaintiff was divorced and remarried, with a teenage daughter, and resided with his wife.   Plaintiff's employment history included an eleven-year stint at Wegmans supermarkets, which ended not because of his alleged impairments, but because he claims he was falsely accused of using a racial slur towards a co-worker. Tr. 233, 453-454.   Plaintiff also had a six-year stint as an unarmed security guard, Tr. 231-232.

As mentioned earlier, after Plaintiff's claim was denied initially and on reconsideration, an ALJ denied his claim, after which he commenced an action in this Court, and the parties stipulated to remand the action for further administrative proceedings, after which the Appeals Council directed that a new hearing be held.

On April 12, 2023, a month before the new hearing, Plaintiff's attorneys wrote to the ALJ concerning outstanding medical records. Tr. 1197-1198.   In pertinent part, the   attorneys, Ms. Comerford and Mr. Militello, stated that they had requested from Life Solutions Psychotherapy,

records described as "3/26/20 to Present, Treating Medical Source Statement." Tr. 1197.   The

attorneys' actual cover letter to Life Solutions, however, did not mention treatment records, but,

instead, requested just a medical source statement, to be provided using an enclosed blank

form:

> This letter is to request additional medical information.   I have enclosed a blank
> Treating Medical Source Statement regarding your patient's mental health
> condition.   Please kindly fill out the same and return it back to our office as soon
> as possible.

Tr. 2022.   The attorneys subsequently filed the completed forms as Exhibit 34F, consisting of

two opinion statements from therapists at Life Solutions.   The first, by Bill Schubmehl, LCSW-

R ("Schubmehl"), is dated August 21, 2020, and the second, by Gail Peterson, LCSW

("Peterson"), is dated April 11, 2023. Tr. 2012-2017.

On May 8, 2023, the new hearing was held before the ALJ.   At the start of the hearing,

the following exchange occurred between the ALJ and Mr. Militello, concerning the

completeness of the evidentiary record:

> ALJ: And we've pre-marked the following Exhibits 1A through 9A, 1B through 34B,
> 1D through 23D, 1E through 23E, and 1F through 36F.   Do you have any objection
> to any of those exhibits?
>
> ATTY: I do not, Your Honor.
>
> ALJ:   And counsel, are you waiting for any more evidence, do we have a complete
> file?
>
> ATTY: We have a complete file.

Tr. 1055.   In that regard, the record consisted of approximately two thousand pages, including

approximately 1,300 pages of medical records. *See*, Exhibits 1F-36F.   In addition to functional

assessment reports from Jack, Schubmehl, and Peterson, the medical records included approximately 160 pages of treatment notes from Jack, and fifteen pages of notes from Life Solutions. *See*, Exs. 9F, 22F, 28F, 34F.   The record also included a written psychiatric evaluation from consultative examiner Adam Brownfeld, Ph.D. ("Brownfeld").   Additionally, the ALJ supplemented the record with interrogatory responses from consulting physician Stephen Menaldino, M.D. ("Menaldino"), who also testified at the hearing concerning Plaintiff's physical impairments.

Following the hearing, on May 19, 2023, the ALJ issued a decision denying Plaintiff's claim for SSDI benefits. Tr. 1024-1041.   Very briefly, the ALJ found that Plaintiff had severe physical and mental impairments; that the impairments did not, either singly or in combination, meet or equal a listed impairment; the Plaintiff nevertheless had the RFC to perform less than a full range of sedentary work; that Plaintiff could not perform any past work; but that Plaintiff could perform other work and was therefore not disabled.[8]

---

[8] For a more detailed summary, *see*, Pl. Memo of Law, ECF No. 6-1 at pp.4-5 ("At step one, the ALJ found Plaintiff had not engaged in substantial gainful between the alleged onset date of May 8, 2018, and the date last insured. Tr. 1027. At step two, he found Plaintiff has severe impairments of "degenerative joint disease of the knees, status post- surgery; laryngopharyngeal reflux disease (LPRD); obstructive sleep apnea; obesity; diabetes mellitus; depressive disorder; and anxiety disorder[.]" Tr. 1027. At step three, he found Plaintiff did not meet or equal any listings. Tr. 1027. At step four, he found Plaintiff had the RFC for, "sedentary work as defined in 20 CFR 404.1567(a) except he can lift and/or carry at least 20 pounds occasionally and 10 pounds frequently; he can frequently balance and stoop; he can occasionally climb ramps and stairs; he can never kneel, crouch, crawl or climb ladders, ropes or scaffolds; he can tolerate no more than frequent exposure to extremes of heat, cold, humidity and wetness; he can tolerate no more than frequent exposure to vibration; he can tolerate no more than frequent exposure to loud work environments; he can tolerate no more than frequent exposure to pulmonary irritants such as strong fumes, odors, dust and gases; he must avoid exposure to hazardous conditions; there can be no commercial driving (defined as work including driving duties); he can perform unskilled tasks, work requiring little or no judgment to do simple duties that can be learned on the job in a short period of time; he can perform work involving simple work-related decisions with few workplace changes; he can occasionally interact with the general public, co-workers and supervisors." Tr. 1029. The ALJ found Plaintiff was unable to perform past relevant work as a merchant patroller, cleaner/housekeeper, or bagger. Tr. 1039. At step five, he found other jobs existing in significant number that Plaintiff could perform. Tr. 1040. These were bench hand, assembler, document preparer, addresser, and tuber operator. Tr. 1040. Thus, the ALJ found Plaintiff not disabled. Tr. 1040.").

In explaining his RFC finding, the ALJ found that the opinions by therapists Schubmehl and Peterson, which effectively opined that Plaintiff was completely disabled due to his mental health symptoms, were unpersuasive, since they were both unsupported by treatment notes and inconsistent with other evidence. Specifically, the ALJ stated:

> At hearing, the claimant testified that he stopped working due to depression and anxiety, learning disability, chromosome 15 disorder; and moods. The claimant testified that he goes to a counselor every 2 weeks. His indicated that his memory is poor and he has to write many things down to remember them. The claimant reported that his concentration is not good. He stated that he forgets what people tell him.
>
> ***
>
> Regarding the claimant's mental impairments, the majority of the claimant's documented treatment has been through Dr. Jack, his primary care provider. The claimant did not establish with Dr. Jack until more than a year after the alleged onset date, on June 20, 2019; at that time, he reported a "learning disability," for which he was "in [the] process of getting permanent disability," and that he was a recovering alcoholic. Anxiety and depression were listed in the claimant's "past medical history," but not part of his assessed impairments. The claimant was also not receiving any specific treatment at time; he reported receiving therapy from "William in Lifesource [sic] Solutions," but attributed this to his alcoholism (Ex. 28F at 31-37).
>
> During a follow-up on August 22, 2019, the claimant requested medication for his anxiety, which was characterized as a "new problem to [Dr. Jack]." The claimant also admitted that his mood was improving with CPAP treatment for sleep apnea. At that time, Dr. Jack initiated the claimant on Lexapro for his anxiety (Ex. 28F at 29-30).
>
> The record reflects improvement in the claimant's subjective complaints with medication. On October 31, 2019, the claimant reported that he was "feeling really good" with Lexapro and therapy. His "usual triggers for anxiety are crowds, stress, and family problems. Since starting Lexapro, [he] has been testing the boundaries of his anxiety by forcing himself to do things that would have previously made him anxious (such as going to Hershey Park which he recently did."   Dr. Jack characterized the claimant's anxiety as "well controlled" (Ex. 28F at 23-24). In

January 2020, the claimant requested an increase of his Lexapro due to increased anxiety and feeling "down" after being "hit with a big bill" (Ex. 28F at 20). On March 25, 2020, the claimant indicated that he had "had an anxiety attack the other day," which was his "first in a while," and he was "able to stop it" with "tools in [his] arsenal" (Ex. 28F at 17-18).

During a follow-up on August 25, 2020, which was primarily related to blood glucose levels, the claimant reported that his "anxiety has been 'perfect.' Friends have noticed a big difference, getting a lot of compliments. Less bothered." Dr. Jack characterized the claimant's anxiety as "stable" (Ex. 28F at 5-6).

The remainder of the record reflects that the claimant has generally had good response to treatment, but experienced exacerbations in the face of some rather significant situational stressors. On December 8, 2020, Dr. Jack added Wellbutrin to the claimant's medications due to the claimant's complaints that "COVID is bringing him down," but he had no other complaints of psychological symptoms and related that he was recently able to go to the zoo (Ex. 29F at 105-106). A follow-up report dated February 8, 2021, indicates that the claimant had some improvement with the Wellbutrin, but his depression worsened after five people close to him had contracted COVID, three were hospitalized, and one passed away; Dr. Jack advised the claimant that therapy would be more helpful than medication, but the claimant reported difficulty establishing with a new provider after his previous one retired (Ex. 29F at 100). The following month, on March 23, 2021, the claimant's depression was characterized as "stable" and his "mood has been good" after beginning therapy with Easter Seals NY (Ex. 29F at 93-94). On August 18, 2021, the claimant reported to Dr. Jack that he would be attending a comedy show at the Erie County Fair and that this would test his anxiety (Ex. 29F at 87).

In Spring 2022, the claimant again indicated an exacerbation of his depression, which was attributed to the declining health of his father and "many deaths of loved ones recently," but he "loves" his new therapist, who "specializes in anticipatory grief" (Ex. 29F at 81).

On October 11, 2022, the claimant presented for a follow-up with Dr. Jack, at which time he indicated that he was "looking for a new therapist he clicks with," and he was experiencing marital and familial discord. The claimant endorsed feelings of depression, but indicated his "anxiety is OK." Dr. Jack referred the claimant for a

"partial hospitalization program for medication management and intensive therapy," which he began more than two months later (Ex. 29F at 70).

The last documented treatment from Dr. Jack occurred on April 26, 2023, at which time she reviewed the claimant's subjective complaints regarding his disability claim, which included allegations of learning disability and borderline personality disorder. Dr. Jack noted that the claimant demonstrated "tangential thinking [and] anxious affect," but also indicated that the claimant's depression is "well controlled with Wellbutrin" (Ex. 35F at 3-4). As noted above, the claimant reported that he received some treatment from Easter Seals NY during the period at issue. It is noteworthy that the claimant reported a history of posttraumatic stress disorder for five years during intake, but these complaints are not present in the treatment records of Dr. Jack (Ex. 31F at 91, for example). Therapy reports show that the claimant generally had the same complaints of situational stressors regarding his family that were present in the records from Dr. Jack, and that the claimant's therapy focused on coping with trauma (Ex. 31F at 6, 32, 45, 59). The claimant stopped attending therapy through Easter Seals NY in November 2021.

On December 1 and 12, 2020, the claimant underwent a neuropsychological assessment by Colleen Saar, Ph.D., during which Dr. Saar noted inconsistencies that made certain results unreliable. Based on her evaluation, which included administration of several clinical tests, Dr. Saar determined that the claimant's performance on a measurement of attention was "not indicative of attention problems," and rating scales were consistent with a "mild level of anxiety," but his[/]claimant's allegations of "severe" depression symptoms were "not congruent with [his] presentation and the results need to be interpreted with caution. Both emotional factors and fluctuations in motivation and effort may be contributing to factors in variability." Similarly, Dr. Saar noted "significant variability" within testing of memory and learning, and that "a formal test of malingering indicates inadequate effort" (Ex. 32F). Therefore, I find that the conclusions and opinion of Dr. Saar are partially persuasive as they were based on accepted clinical testing measures, but the claimant's "fluctuations" and "variability" in performance, including clinical evidence of malingering, reduced the reliability of testing results.

Turning back to the partial hospitalization program recommended by Dr. Jack in

13

October 2022, this consisted of medication management, individual therapy, and group therapy, from late December 2022 through January 6, 2023. During a social work discharge planning session on January 3, 2023, the claimant indicated that it has been approximately one year since he last saw a therapist on a regular basis, and he "did not connect with treatment after his therapist retired."   The claimant also reported that he did not take the Zoloft that was prescribed to him, and he had "weaned himself off the other psychiatric medication he was taking" (Ex. 29F at 29-30). Additional records reflect that the claimant only wanted to be on Wellbutrin as a "mood

stabilizer," but did not want to take any other medication. A mental status examination showed "constricted" affect and "blah" mood, but was otherwise within normal limits (Ex. 29F at 21-22).

On January 12, 2023, the claimant established treatment with Peter Wilder, LCSW, [at the University of Rochester Medical Center,] at which time the claimant endorsed symptoms of depression and anxiety, including lack of motivation and energy to perform activities of daily living, and avoiding going into public. The claimant also reported that he dropped out of his partial hospitalization program early. A mental status examination at that time was entirely within normal limits (Ex. 33F at 1, 4). During a follow-up on January 26, 2023, Mr. Wilder noted that the claimant "continues to use alcohol. He appears to have minimal insight into his alcohol use and the impact it might be having on his mood." A mental status examination was again within normal limits, except for "poor" impulse control and insight" (Ex. 33F at 8). The last documented treatment from Mr. Wilder, dated February 9, 2023, indicates that he believed the claimant's symptoms "might be due to alcohol use and ongoing addiction," and that he would not go further with intake at the clinic until the claimant completed a "CD [chemical dependency] evaluation." The claimant did not receive any documented treatment from Mr. Wilder after that date (Ex. 33F at 11).

In March 2020, treating social worker Bill Schubmehl, LCSW-R, [at Life Solutions] reported that the claimant's mental impairment precludes the claimant's abilities to understand and remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration for 2-hour segments; to complete a normal workday and workweek without interruptions from psychologically based symptoms; to perform at a consistent pace without an unreasonable number and length of rest periods; and to travel in unfamiliar places or use public transportation. Mr. Schubmehl indicated that the claimant claimant's impairments would preclude

the claimant's from performing for more than 20% of the workday in his abilities to remember work-like procedures; to carry out very short and simple instructions; to maintain regular attendance and be punctual without customary, usually strict tolerances; to sustain an ordinary routine without special supervision; to work in coordination with or proximity to others without being unduly distracted; to make simple work-related decision; to accept instructions and respond appropriately to criticism from supervisors; to respond appropriately to changes in the routine work setting; and to deal with normal work stress. Mr. Schubmehl reported that from 11-to-20-percent of the workday, the claimant's mental impairment would preclude him from understanding and remembering very short and simple instructions; asking questions or requesting assistance; interacting appropriately with the general public getting along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes; being aware of normal hazards and taking appropriate precautions; and setting realistic goal or making plans independently of others. He indicated that the claimant would be off-task more the 30 percent of a 8-hour workday, 5 days per week, in a competitive work environment; would be absent from work more than 4 days per month; his symptoms and functional limitation would increase if working in a full-time positions; and was unable to work in a full-time competitive positions, 8 hours per day, 5 days per week (Ex. 18F).

Under Social Security regulations, the "most important factors" when evaluating opinion evidence are "supportability" and "consistency;" "supportability" is defined as medical records and other evidence from that source that support their opinion, while "consistency" is defined as whether the opinion is consistent with evidence from other medical and nonmedical sources of record (20 CFR 404.1520c(b)(2) and (c)(1)-(2)).

I must find Mr. Schubmehl's opinions to be unpersuasive. <u>Regarding the "supportability" of his opinion, Mr. Schubmehl did not provide any treatment records, other than an initial evaluation of the claimant performed on May 31, 2018, at which time the claimant indicated a history of depression and anxiety, along with stressors related to medical issues, his "daughter's problems," "employment problems," and "trauma history." No mental status examination was performed at that time (Ex. 9F; 22F at 3-6). Mr. Schubmehl has not provided any other treatment records or examinations</u>.

<u>Other medical evidence is also inconsistent with the opinion of Dr. Schubmehl</u>. As discussed above, the record shows that the claimant had significant improvement

in his anxiety with treatment, and that he was able to engage in social activities, such as a plan to go to an amusement park and attend the zoo. Even when the claimant had exacerbations of depression related to his familial and domestic stressors, he generally indicated good control over his anxiety until he started to become noncompliant with his anxiety medications in late 2022, ceasing use of his Lexapro and not following through with his prescribed Zoloft. The treatment reports from Dr. Jack also show that the claimant had generalized complaints of depression related to his stressors, especially after losing family members and the progressing illness of his father, but few complaints of specific symptoms. Additionally, the findings during the consultative psychological examination also do not support the degree of limitation reported by Mr. Schubmehl.

Therefore, Mr. Shubmehl's opinions cannot be found persuasive because the provided intake report is insufficient to establish the duration and frequency of treatment, and does not provide any objective or clinical evidence to support his opinion, and the degree of limitations are inconsistent with other medical evidence during the period at issue.

The record also contains statements from Mr. Schubmehl that he considers the claimant unable to work in any capacity (Ex. 9F, 22F, 27F). Social Security regulations dictate that statements on issues reserved for the Commissioner, such as the claimant's ability to work, are inherently neither valuable nor persuasive (20 CFR 404.1520b(c)(3)(i)).

On April 11, 2023, Gail Peterson, LCSW-R, [also at Life Solutions,] prepared an additional statement regarding the claimant's mental limitations, in which she indicated that the claimant is totally precluded from all mental work-related activities, and that he would be absent from work more than four days per month (Ex. 34F at 2-6).

I also must find that the opinion of Ms. Peterson is unpersuasive. In her statement, Ms. Peterson indicated that she first saw the claimant on March 17, 2022, and then five times after on a biweekly basis (Ex. 34F at 2). However, the record contains no evaluation, examination, or treatment reports from Ms. Peterson or Life Solutions Psychotherapy, except for the initial examination by Mr. Schubmehl from May 2018. Therefore, the record contains no evidence by which to evaluate the "supportability" of Ms. Peterson's opinion under Social Security regulations. Furthermore, other medical evidence, especially the treatment reports from Dr.

16

> <u>Jack and the therapy reports from Easter Seals NY from 2021 are entirely
> inconsistent with Ms. Peterson's total preclusion from all work-related activities for
> the reasons set forth in evaluation of Mr. Schubmehl's opinion supra.</u>

Tr. 1030, 1032-1036 (emphasis added).

The ALJ further stated, as part of the discussion explaining his RFC finding, that he found

Dr. Jack's opinion concerning Plaintiff's physical and mental impairments only partially

persuasive, stating:

> In March 2020, Dr. Jack indicated that the claimant's pain and other symptoms
> would constantly interfere the claimant's attention and concentration needed to
> perform even simple work and that the claimant was incapable of tolerating even
> "low stress" work. She indicated that the claimant is able to walk less than 1 block
> with rest or severe pain and stand and walk for less than 2 hours during an 8-hour
> workday. She stated that the claimant could stand for about 1 hour at time. She
> reported that that the claimant could sit less than 2 hours during an 8-hour workday
> and for 1 hour at a time. The claimant would need to walk every 20 minutes for
> about 30 minutes; would require a job that permits shifting positions at-will from
> sitting, standing, and walking; and would require unscheduled breaks frequently
> for more than 30 minutes. She indicated that the claimant should elevate his legs
> to chair/ottoman level while sitting. The claimant could rarely lift and carry 10
> pounds; frequently lift and carry less than 10 pounds; never climb stairs, twist,
> crouch, stoop, and climb ladders; rarely stoop; and would be absent from work
> about 4 or more days per month (Ex. 19F).

> In May 2020, Dr. Jack indicated that the claimant's pain and other symptoms would
> frequently interfere [with] the claimant's attention and concentration needed to
> perform even simple work and that the claimant was incapable of tolerating even
> "low stress" work. She indicated that the claimant is able to walk less than 1 block
> with rest or severe pain and stand and walk for less than 2 hours during an 8-hour
> workday. She stated that the claimant could stand for about 30 minutes at time.
> She reported that that the claimant could sit less than 2 hours during an 8-hour
> workday and for 20 minutes at a time. The claimant would need to walk every 15
> minutes for about 10 minutes; would require a job that permits shifting positions
> at-will from sitting, standing, and walking; and would require unscheduled breaks
> during every 15-30 minutes for 10 to 15 minutes. She indicated that the claimant

should elevate his legs about 45 degrees 75% of an 8-hour workday. The claimant could occasionally lift and carry 10 pounds; frequently lift and carry less than 10 pounds; occasionally climb stairs; rarely twist; never stoop, crouch, squat, or climb ladders; and would be absent from work about one day per month (Ex. 23F).

Dr. Jack prepared an additional statement regarding the claimant's work-related limitations on April 26, 2023. On this occasion, Dr. Jack indicated that the claimant is capable of sitting for 30 minutes at a time and at least six hours in an eight-hour workday, standing for one hour at a time and standing/walking in combination for less than two hours in an eight-hour workday, and that he requires the ability to change position at will and take unscheduled breaks of 30 minutes during the workday. Dr. Jack also indicated that the claimant requires the ability to elevate his legs to 90 degrees for 25-percent of the workday for comfort, and walk around for 10 minutes every 30 minutes. Furthermore, Dr. Jack indicated that the claimant can lift and carry less than 10 pounds frequently, up to 10 pounds occasionally, and up to 20 pounds rarely, never perform any twisting, stooping, crouching, or climbing, pain and other symptoms would "constantly" interfere with attention and concentration, he is incapable of even low stress work, and he would be absent more than four days per month. Regarding the claimant's mental limitations, Dr. Jack indicated that he has a "category IV" or "category V" limitation for almost all mental work- related tasks; "category IV" is defined as preclusion of performance for more than 20-percent of an eight-hour workday, whereas a "category V" limitation indicates a total preclusion from all performance in a regular work setting (Ex. 36F).

The opinion of Dr. Jack regarding the claimant's physical impairments is partially persuasive as the record supports a conclusion that the claimant has significant limitation for standing, walking, lifting, and carrying in an eight-hour workday, as set forth in the interrogatories and testimony from Dr. Menaldino. Records from Dr. Jack show that the claimant had been considered morbidly obese, but was successful in losing weight during the period at issue (Ex. 29F at 93, for example). Physical examinations performed by Dr. Jack are also not entirely consistent with her assessed limitations, as she routinely observed that the claimant had normal gait and no significant abnormalities of neurologic functioning or in his extremities. When comparing the April 26, 2023, treatment report with the remainder of Dr. Jack's records, it is reasonable to conclude that the degree of limitations as largely based on the claimant's subjective reports rather than clinical observations, as the physical examination performed at that time was also within normal limits (Ex. 35F

at 4). As discussed above, the totality of the record regarding the claimant's physical impairments does not support a complete preclusion from any postural activities, or Dr. Jack's opinion that his physical impairments would result in any significant lapse in concentration or attendance.

Turning to the mental limitations assessed by Dr. Jack, I find that her opinion is unpersuasive. Unlike other sources, most documented mental health care has been administered by Dr. Jack.  These records show that the claimant initially complained of anxiety, but had good response to Lexapro, and his symptoms have generally been stable during the period at issue. The claimant has also had generally good response to Wellbutrin for symptoms of depression, and that these symptoms have been exacerbated by rather significant situational stressors, which have been described in detail throughout this decision. However, the claimant has not alleged any specific deficits related to his increased anxiety. Similar to the physical limitations above, it appears that Dr. Jack had the claimant describe his own perceived limitations in detail during the April 2023 examination and relied heavily on his statements, rather than basing the assessed restrictions on her own clinical observations. Therefore, I find that the degree of limitations set forth by Dr. Jack regarding the claimant's mental impairments is neither supported by her own records or consistent with the therapy reports from Easter Seals NY.

***

Dr. Brownfeld opined that the claimant has no evidence of limitation in understanding, remembering, and applying simple directions and instructions, using reasoning and judgment to make work-related decisions, maintaining personal hygiene and appropriate attire, and being aware of normal hazards and taking appropriate precautions. He is mildly limited in regulating emotions, controlling behavior, and maintaining well-being and interacting adequately with supervisors, coworkers, and the public. He is moderately limited in sustaining concentration and performing a task at a consistent pace and sustaining an ordinary routine and regular attendance
at work. He is markedly limited in applying complex directions and instructions (Ex. 3F). I find Dr. Brownfeld's opinion to be persuasive because it is it generally consistent with Dr. Juriga's opinion. However, based upon a careful review of the evidentiary record and testimony at hearing, I find greater social limitations.

Tr. 1036-1038.

On September 1, 2023, Plaintiff commenced this action, and on December 6, 2023, he

filed the subject motion for judgment on the pleadings.   As mentioned earlier, Plaintiff alleges, first, that when assessing the opinions of Dr. Jack, the ALJ "failed to address supportability and consistency and relied on selectively chosen evidence to reject the opinion[s] [concerning his mental impairments.]"[9] More specifically, Plaintiff contends that the ALJ erroneously did the following: 1) disregarded Jack's opinion in part because it relied heavily on Plaintiff's subjective complaints rather than on objective findings; 2) failed to discuss specific entries in Jack's records that supported his disability claim; 3) inaccurately described Jack's opinion as being inconsistent with evidence from Easterseals; 4) failed to discuss other evidence that was consistent with Jacks's opinion; 5) relied too-heavily on the opinion of a non-examining consultative psychologist; and 6) failed to discuss the consistency between the opinions of Jack, Schubmehl and Peterson.

Plaintiff further maintains that the ALJ failed to develop the record to obtain missing mental-health counseling records from Schubmehl and Peterson at Life Solutions,[10] and that such error was not harmless since the ALJ cited the absence of such records as a basis to find that the opinions of Schubmehl and Peterson were unsupported.   In support of this argument, Plaintiff observes that the ALJ has a duty to develop the record even where, as here, the claimant is represented by an attorney.   Plaintiff further suggests that the ALJ's duty to obtain Schubmehl's and Peterson's treatment notes was "triggered," in part, because Plaintiff's attorneys had been unsuccessful in obtaining them. *See*, Pl. Memo of Law, ECF No. 6-1 at p. 27 ("Plaintiff's representative did request treatment records, as seen by the authorization from

---

[9]  Pl. Memo of Law, ECF No. 6-1 at p. 17.
[10]  Pl. Memo of Law, ECF No. 6-1 at p. 25.

March 2023, which stated, "[i]nclude [p]sychotherapy notes[.]"  Overall, the ALJ's duty to develop the record was triggered[.]").

The Commissioner opposes Plaintiff's motion and has cross-moved for judgment on the pleadings, as discussed more fully below.

The Court has considered the parties' submissions and the relevant portions of administrative record.

DISCUSSION

The ALJ's Alleged Failure to Develop the Record

Plaintiff maintains that remand is required since the ALJ failed to develop the record by obtaining treatment notes from Schubmehl and Peterson.  Although, Plaintiff has apparently never subsequently obtained the allegedly-missing treatment notes, and, consequently, the Court has no idea whether the notes actually exist, or what information they might contain.

This failure-to-develop-the-record argument is the second argument raised in Plaintiff's papers, but the Court addresses it first, since "[t]he threshold question is whether the claimant received a full and fair hearing." *Morris v. Berryhill*, 721 F. App'x 25, 27 (2d Cir. 2018). Accordingly, the Court first considers Plaintiff's contention that the ALJ failed to develop the record. *See, Lopez v. Comm'r of Soc. Sec.*, 622 F. App'x 59, 60 (2d Cir. 2015) ("Before assessing whether the ALJ's determination was supported by substantial evidence, we must first be satisfied that the claimant has had a full hearing.   Whether dealing with a *pro se* claimant or one represented by counsel, the ALJ must develop the claimant's complete medical history.") (citations and internal quotation marks omitted).

On this point, the law concerning the ALJ's general duty to develop the record is clear:

21

In making any determination with respect to whether an individual is under a disability or continues to be under a disability, the Commissioner of Social Security shall consider all evidence available in such individual's case record, and shall develop a complete medical history of at least the preceding twelve months for any case in which a determination is made that the individual is not under a disability. In making any determination the Commissioner of Social Security shall make every reasonable effort to obtain from the individual's treating physician (or other treating health care provider) all medical evidence, including diagnostic tests, necessary in order to properly make such determination, prior to evaluating medical evidence obtained from any other source on a consultative basis.

42 U.S.C.A. § 423(d)(5)(B) (West 2024).

It is well settled that the ALJ's duty to develop the record applies even when the claimant is represented:

"[W]here there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history even when the claimant is represented by counsel or by a paralegal." *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) (alterations and internal quotation marks omitted). The ALJ's duty to develop the record reflects "the essentially non-adversarial nature of a benefits proceeding." *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) (internal quotation marks omitted).

***

However, "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Rosa*, 168 F.3d at 79 n.5 (internal quotation marks omitted). An ALJ's failure to develop the record warrants remand. *See id*. at 79–80.

*Rivers v. Kijakazi*, No. 21-1935-CV, 2023 WL 2485467, at *1 (2d Cir. Mar. 14, 2023).

Applying this rule, courts have held it error for an ALJ to reject a medical opinion on the ground that it is unsupported by treatment notes and/or findings, without first contacting the medical provider to request the missing notes. *See, e.g., Burton-Mann v. Colvin*, No. 15-CV-7392 (JGK), 2016 WL 4367973, at *5 (S.D.N.Y. Aug. 13, 2016) ("In this case, Dr. Contreras

neglected to fill in the portion of the assessment asking for a description of the plaintiff's limitations and any "medical/clinical findings that support this assessment."   The ALJ found this omission significant because it left the doctor's opinion about the plaintiff's physical impairments---an opinion allegedly contradicted by the record---unsubstantiated.   Faced with this gap in the treating physician's report, the ALJ had an affirmative duty to seek out more information from the treating physician and to develop the administrative record accordingly.") (citations and internal quotation marks omitted); *see also, id*. at *6 ("The ALJ could not rely on the absence of notes when the ALJ failed to obtain them. Accordingly, the ALJ erred by giving Dr. Contreras' opinion limited weight because of its inconsistency with the record without first attempting to resolve the inconsistencies and fill the gaps."); *Bushansky v. Comm'r of Soc. Sec*., No. 13 CIV. 2574 JGK, 2014 WL 4746092, at *6 (S.D.N.Y. Sept. 24, 2014) ("To the extent that facts necessary for this determination were not provided, the ALJ had a duty to contact Dr. Massa to develop the record further. The ALJ could not rely on the absence of treatment and therapy notes when he failed to obtain them. Accordingly, giving Dr. Massa's opinion limited weight due to insufficient evidence without first attempting to fill the gaps in the record was error.").

However, as relevant here, there are also numerous district court decision from this Circuit finding that an ALJ's duty to develop the record is lessened or satisfied where the claimant's attorney has assured the ALJ that the record is complete. *See, e.g, Lucius R. v. O'Malley*, No. 3:22-CV-01312-MPS, 2024 WL 1200181, at *15–16 (D. Conn. Jan. 22, 2024) ("[I]t matters that the Plaintiff's counsel informed the SSA that the record was complete. An ALJ's duty to develop the record is not unlimited; he is required only to take all reasonable steps to do so, and he "has taken reasonable steps to complete the medical record when [he]

asks the claimant's attorney at a hearing if the medical records ... are complete, and the attorney answers affirmatively." *Jason C. v. Berryhill*, No. 6:17-cv-1106 (TWD), 2019 WL 1409804, at *5 (N.D.N.Y. Mar. 28, 2019) (citing cases).   . . .   In this case, the ALJ held the record open for thirty days after the hearing, after which Plaintiff's counsel's office called the SSA and advised that, aside from one possible ophthalmology note, "the record [was] complete." The Plaintiff did not identify any of the alleged gaps that he now cites as bases for remand.") (citations omitted); *Melissa I. o/b/o R.J.R.D. v. Comm'r of Soc. Sec.*, 2022 WL 3358138, *4 (W.D.N.Y. 2022) ("Although the ALJ has a duty to develop the record, such a duty does not permit a claimant, through counsel, to rest on the record – indeed, to exhort the ALJ that the case is ready for decision – and later fault the ALJ for not performing a more exhaustive investigation"); *Jennifer S. v. Comm'r of Soc. Sec.*, No. 20-CV-782, 2022 WL 42413, at *4–5 (W.D.N.Y. Jan. 5, 2022) ("Plaintiff argues that the record was inadequate because it did not include Ms. Jack's counseling notes. . . . [However, a]t the hearing, the ALJ explicitly asked Plaintiff's counsel if there were "[a]ny documents that are outstanding that should be part of the record?" Plaintiff's counsel stated that they were waiting for a questionnaire from Best Health and treatment records from Kenmore Mercy Hospital.   The attorney did not mention any outstanding treatment records from Best Health or LCSW Jack. The ALJ then confirmed, "So, it's just a medical source statement and Kenmore?" and Plaintiff's counsel responded affirmatively.   The ALJ held the record open to ensure that those documents could be included.   Although an ALJ has a duty to develop the record, this duty is lessened where, as here, Plaintiff's counsel fails to mention the records at the administrative level.") (citation omitted, collecting cases); *cf.*, *Dejesus Gonzalez v. Comm'r of Soc. Sec.*, No.

24

16-CV-4612 (BMC), 2017 WL 1051119, at *4 (E.D.N.Y. Mar. 19, 2017) ("It is, again, ironic that

the same law firm that represented plaintiff at the hearing is accusing the ALJ of failing to

obtain records when counsel at the hearing never alerted the ALJ to any gaps in the record.

Plaintiff relies on *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996), for the rule that an ALJ must

develop the record even if a claimant is represented by counsel. Although that oft-quoted

dictum is accurate, I have not seen any case applying that rule to a situation where the alleged

gap in the record is a theory of counsel in hindsight, rather than one that should have been

reasonably apparent to the ALJ. An ALJ will generally be found to have breached his duty

where there were obvious deficiencies in the record. If plaintiff's attorney wanted to come up

with a creative theory on how there might be more documents, he needed to have done it

before the ALJ, not in a review proceeding.") (citations omitted).

These rulings make sense for a number of reasons.   First, as a matter of fairness and

judicial efficiency, counsel should not be permitted to game the system by asserting that the

record is complete, and then, once and adverse decision has issued, crying foul.

Furthermore, even assuming that courts are required to overlook such behavior by counsel

due to the non-adversarial nature of the disability inquiry, the rulings reflect common sense,

since if there truly was an "obvious gap" in the record, one would expect that reasonably

competent counsel would have alerted the ALJ to such fact, rather than asserting that the

record was complete.

With these points in mind, the Court here finds that Plaintiff's failure-to-develop- the-

record argument lacks merit.   Preliminarily, the Court finds it somewhat disingenuous for

Plaintiff to suggest that the ALJ's duty to request the missing treatment notes from Schubmehl

and Peterson was "triggered," in part, because Plaintiff's attorney had already tried unsuccessfully to obtain the records. *See*, Pl. Memo of Law, ECF No. 6-1 at p. 27 ("Plaintiff's representative did request treatment records, as seen by the authorization from March 2023, which stated, "[i]nclude [p]sychotherapy notes[.]"   Overall, the ALJ's duty to develop the record was triggered[.]").   Plaintiff here is referring to the fact that on March 15, 2023, he signed an authorization form, authorizing Life Solutions Psychotherapy to provide his attorney with records, including "psychotherapy notes." Tr. 2021.   However, while Life Solutions may have been *authorized* to release treatment notes, the cover letter that Plaintiff's counsel sent Life Solutions did *not ask* for treatment notes.   Rather, counsel's cover letter to Life Solutions requested just a medical source statement, to be provided using a blank form sent to Life Solutions. Tr. 2022 ("This letter is to request additional medical information.   I have enclosed a blank Treating Medical Source Statement regarding your patient's mental health condition.   Please kindly fill out the same and return it back to our office as soon as possible.").   Consequently, the assertion that "Plaintiff's representative did request *treatment records*" prior to the most-recent hearing is dubious.

What is clear, however, is that prior to the hearing, Plaintiff's counsel was aware the Life Solutions had not provided treatment notes from Schubmehl or Peterson, but, rather, had merely returned the assessment forms completed by Schubmehl and Peterson.  If, as Plaintiff now claims, his "representative did request treatment records," one might expect that counsel would have re-contacted Life Solutions and asked them to send the treatment records.   Or, alternatively, counsel could have made the ALJ aware of the situation, and either asked for additional time to obtain the treatment notes, or asked for the ALJ's assistance in obtaining them.

However, Plaintiff's counsel did none of those things.   Instead, when specifically asked by the ALJ whether the record was complete or whether counsel was still waiting to receive records, counsel affirmatively stated that the record was complete. See, Tr. 1055 ("ALJ:   And counsel, are you waiting for any more evidence, do we have a complete file? ATTY: We have a complete file.").   It was reasonable for the ALJ to rely on counsel's assessment of the record, particularly since this was the second full hearing in the matter, following the remand of the action from federal court, and the record was voluminous.   Now, however, members of the same law firm are before the Court, asserting that the ALJ erred in relying upon counsel's representation that the record was complete, and that such error was harmful because it caused the ALJ to find that the opinions by Schubmehl and Peterson were not well-supported.

Under facts resembling those presented here, a judge of the U.S. District Court for the Northern District of New York rejected a similar argument that the ALJ had erred by failing to develop the record, stating:

> Plaintiff argues that the ALJ improperly rejected PA Bossi's opinion for lack of supportability, because the ALJ did not seek out the three missing treatment notes by PA Bossi in order to fully develop the record. Plaintiff appears to have conflated the new standards for evaluating medical evidence with the ALJ's duty to develop the record.
>
> The supportability factor under 20 C.F.R. § 416.920c(c)(1) states that a medical opinion's persuasiveness is based, in part, on the objective medical evidence and supporting explanations provided by a medical source with his or her ultimate conclusions. In this case, the ALJ properly found that within her own [medical source statement] [("MSS")], PA Bossi did not cite to any evidence, or provide any commentary, supporting her opined limitations. The MSS is rendered in the form of a check-box questionnaire, and the only commentary provided is PA Bossi's admission that she had not treated plaintiff's lower back and right ankle injuries. (T. 705). The applicable regulations clearly permitted the ALJ to detract

persuasiveness from PA Bossi's opinion based on her failure to support her restrictive findings with any supporting evidence. PA Bossi's failure to support her own opinion was, as determined by the ALJ, exacerbated by the fact that her restrictive limitations were inconsistent with plaintiff's history of benign physical and neurological examinations by various medical sources during the relevant disability period. (T. 19).

Plaintiff's contention that the ALJ failed to develop the record as to PA Bossi's treatment notes, while a separate issue, [is] also meritless. At the administrative hearing, the ALJ explicitly asked plaintiff's counsel whether the record was complete as to medical evidence. (T. 42-43). Counsel responded in the affirmative, and neither plaintiff nor counsel stated that additional medical records needed to be obtained. Moreover, despite his present contentions it is apparent that plaintiff did not provide the missing records to the Appeals Council after the administrative hearing, has not provided them to this court upon judicial review, and has failed to even describe what objective evidence these records possess. Under the circumstances, this court is hard pressed to find that the ALJ was derelict in her duty to develop the record. *See Curley v. Comm'r of Soc. Sec. Admin.*, 808 F. App'x 41, 44 (2d Cir. 2020) (finding no failure to develop the record where the attorney did not state at the hearing that any records were missing, and he did not "provide them to the district court [or] describe their contents"); *Streeter v. Comm'r of Soc. Sec.*, No. 5:07-CV-858 (FJS), 2011 WL 1576959, at *4 (N.D.N.Y. Apr. 26, 2011) (holding an ALJ had satisfied her duty to develop the record when "the ALJ specifically asked Plaintiff's counsel, during the hearing, if the medical records were complete, to which Plaintiff's counsel responded affirmatively").

*Jeffrey G. v. Comm'r of Soc. Sec.*, No. 5:20-CV-1016 (ATB), 2021 WL 4844146, at *11–12 (N.D.N.Y. Oct. 18, 2021).

The Court adopts this same reasoning here, and finds that the ALJ did not err, either in failing to develop the record, or in considering the lack of supporting treatment notes when evaluating the supportability of the opinions from Schubmehl and Peterson.

Alternatively, even putting aside counsel's conduct, the Court agrees with Defendant that the record clearly appeared to be complete, and that there was no "obvious gap."   The record

consisted of approximately two-thousand pages, including a significant amount of evidence concerning Plaintiff's mental impairments, and following the hearing the ALJ left the record open for Plaintiff's counsel to submit other additional records, which counsel did. Tr. 1088.   Moreover, the ALJ stated in his decision, and Plaintiff has not challenged here, that most of Plaintiff's mental health treatment for his alleged disabling impairments of anxiety and depression was provided by Dr. Jack, whose records Plaintiff does not claim are incomplete, and not by either Schubmehl or Peterson, and that Plaintiff's treatment at Life Solutions mainly involved treatment for alcohol abuse, which he did not list as one of his disabling impairments. Tr. 463; 493; 1032-1033 ("Regarding the claimant's mental impairments, the majority of the claimant's documented treatment has been through Dr. Jack, his primary care provider.  . . .  The claimant . . . reported receiving therapy from "William in Lifesource Solutions," [(referring to Schubhehl)] but attributed this to his alcoholism."); 1288 (Treatment note by Dr. Jack, indicating that she was treating Plaintiff for anxiety, while Plaintiff was seeing Schubmehl for therapy related to alcoholism: "Recovering alcoholic.   Stopped drinking last February.   No AA.   Therapist: William in Lifesource Solutions").

Where a record is otherwise complete, missing notes do not necessarily create an obvious gap in the record that an ALJ has to develop, and under the circumstances presented here, including the fact that Plaintiff has not made any offer of proof concerning what supportive findings the alleged notes might contain,[11]  Plaintiff has not shown that the absence of treatment

---

[11] Plaintiff relies on the absence of the alleged records *per se*, without attempting to show that the records contain information that is favorable to his claim. *See, e.g., Morris v. Berryhill*, 721 F. App'x at 28 ("[In *Lopez v.Comm'r of Soc. Security*, 622 Fed.Appx. at 61], [t]he court concluded that the absence of the hospital stay [records] "creat[ed] an obvious gap in the record" and remanded for the ALJ to further develop the record. But an overnight hospital stay is likely to be a serious and critical medical event that could materially change the weight of the evidence on the disability determination; the potentially missing records here would consist of routine check-up

notes from Schubmehl and Peterson constituted such a gap.   Accordingly, this aspect of Plaintiff's motion is denied.

### The ALJ's Finding Regarding the Supportability and Consistency of Dr. Jack's Opinion is Supported by Substantial Evidence and is Not the Product of Legal Error

Plaintiff next maintains that the ALJ erred when evaluating the opinion of Dr. Jack concerning Plaintiff's mental impairments, [12] allegedly since the ALJ "failed to address supportability and consistency and relied on selectively chosen evidence to reject the opinion[s] [concerning his mental impairments.]"[13] More specifically, Plaintiff contends, first, that the ALJ erred by relying on selectively-chosen evidence without addressing the overall weight of evidence supporting Plaintiff's alleged mental limitations.   Plaintiff also alleges that the ALJ erred by finding Jack's opinion was not well-supported insofar as it appeared to be largely based on Plaintiff's subjective complaints rather than on Jack's own findings.   Further, Plaintiff alleges that the ALJ's explanation of his supportability and consistency analysis was deficient, since he "cherry picked" evidence, such as by stating that Jack's treatment notes showed that Plaintiff's mental health symptoms were largely stable, without mentioning other sections of Jacks's notes describing exacerbation of those symptoms.   Plaintiff also contends that the ALJ's consistency discussion was erroneous insofar as it claimed Jack's opinion was inconsistent with treatment notes from Easterseals, without providing specifics.   Similarly, Plaintiff contends that the ALJ

---

and progress notes, with no indication that they contain significant information. It is not even clear that any records are actually missing.").

[12] Although Dr. Jack provided opinions concerning Plaintiff's physical and mental impairments, Plaintiff's argument here is focused on Jacks's opinion concerning the mental impairments. *See*, ECF No. 6-1 at5 pp. 17, 19.

[13] Pl. Memo of Law, ECF No. 6-1 at p. 17.

failed to acknowledge that the report from Dr. Saar, whom plaintiff retained to perform an examination in support of his application for SSDI benefits, Tr. 1979, is consistent with Dr. Jack's opinion.   Additionally, Plaintiff asserts that the ALJ erred by relying too heavily on the opinions of the non-treating agency consultative doctors, Drs. Brown and Juriga.   And, finally, Plaintiff alleges that the ALJ erred by failing to discuss the consistency of the opinions from Jack, Schubmehl and Peterson.   Plaintiff maintains that these errors were not harmless, since if the ALJ had accepted the opinions of Jack, Schubmehl, and/or Peterson, he would have found Plaintiff disabled, since, for example, Jack indicated that Plaintiff would miss more than four days of work per month due to his symptoms.

Defendant, meanwhile, argues that viewing the ALJ's decision as a whole, he properly evaluated the evidence, and his findings regarding the supportability and consistency of Dr. Jack's opinion are supported by substantial evidence.   Defendant states, for example, that "[t]he ALJ reasonably found Dr. Jack's opinions unpersuasive as they were not supported by her own treatment records which, as shown above, demonstrated that Plaintiff had a good response to medications and that Plaintiff's symptoms [were] generally stable during the period at issue." ECF No. 8-1 at p. 24.   Defendant also maintains that the ALJ appropriately considered that Jack's opinions appeared to be based primarily on Plaintiff's own description of his symptoms, which were not consistent with Jack's own reported findings, citing *Gates v. Astrue*, 338 F.App'x 46, 49 (2d Cir. Jul. 16, 2009). *See*, ECF No. 8-1 at p. 25 ("[T]he ALJ did not reject Dr. Jack's opinions merely because they were based on Plaintiff's subjective complaints, but also found the opinions unsupported by Dr. Jack's own treatment records and inconsistent with other evidence.").   Finally, Defendant contends that the ALJ did not err in failing to consider the

consistency between the opinions of Jack, Schubmehl, and Peterson, but rather, that the ALJ properly rejected each of those opinions as being both unsupported and inconsistent with other evidence of record.

The basic legal principles concerning an ALJ's duty to evaluate the supportability and consistency of medical opinions are clear:

> The two "most important factors" for determining the persuasiveness of medical opinions are consistency and supportability, and an ALJ is required to "explain how [he] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. § 416.920c(b)(2).
>
> With regard to "supportability," the regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(1). The regulations provide that with regard to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. 416.920c(c)(2).
>
> ***
>
> An ALJ's failure to explain the supportability and consistency of the medical opinions in the record constitutes procedural error. *See Estrella v. Berryhill*, 925 F.3d 90, 96 (2d Cir. 2019); *Loucks v. Kijakazi*, No. 21-1749, 2022 WL 2189293, *2 (2d Cir. June 17, 2022) (summary order) (finding that "the ALJ committed procedural error by failing to explain how it considered the supportability and consistency of medical opinions in the record").[14] However, "if 'a searching review of the record' assures [the court] 'that the substance of the [regulation] was not traversed,'" the court may affirm the Commissioner's decision. *Loucks*, 2022 WL 2189293, at *2 (quoting *Estrella*, 925 F.3d at 96 (*quoting Halloran v. Barnhart*, 362

---

[14] The Second Circuit has indicated that an ALJ should provide some degree of explanation on these points beyond merely indicating, for example, that he or she finds that an opinion is, or is not, well supported or consistent with the record. *See, Loucks v. Kijakazi*, 2022 WL 2189293 at *2 ("Here, the ALJ committed procedural error by failing to explain how it considered the supportability and consistency of medical opinions in the record.   .   .   [T]he ALJ did not address the opinion's supportability or explain how the opinion was consistent with the record, except to conclude that it was.") (emphasis added).

F.3d 28, 32 (2d Cir. 2004))).

*Jason A. L. v. Comm'r of Soc. Sec.*, No. 521CV477FJSTWD, 2022 WL 4354363, at *2 (N.D.N.Y. Sept. 20, 2022).

Additionally, where an ALJ makes an RFC finding that conflicts with a medical opinion, the ALJ must explain why the conflicting opinion was not adopted, and in doing so the ALJ cannot ignore or mischaracterize evidence. *See*, Titles II & Xvi: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P (S.S.A. July 2, 1996) ("The RFC assessment must always consider and address medical source opinions. *If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted*.") (emphasis added).

> Generally, an ALJ must reconcile discrepancies between his or her RFC assessment and medical source statements. SSR 96-8p, 1996 WL 374184, at *7; *see Dioguardi v. Comm'r of Soc. Sec.*, 445 F. Supp. 2d 288, 297 (W.D.N.Y. 2006). "If the ALJ's RFC finding conflicts with an opinion from a medical source, the ALJ 'must explain why the opinion was not adopted.'" *Williams v. Colvin*, No. 13-roncv-5431 (RLE), 2015 WL 1223789, at *8 (S.D.N.Y. Mar. 17, 2015) (quoting SSR 96-8p); *accord Garcia v. Berryhill*, No. 17-cv-10064 (BCM), 2018 WL 5961423, at *11 (S.D.N.Y. Nov. 14, 2018). While an "ALJ is not required to explicitly reconcile every conflicting shred of evidence in the record, an ALJ cannot simply selectively choose evidence in the record that supports [his] conclusions." *Williams*, 2015 WL 1223789, at *8 (cleaned up); *see also Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) (an ALJ may not "arbitrarily substitute his own judgment for competent medical opinion").

*Lynch v. Commissioner*, No. 22CIV5620CSAEK, 2024 WL 728483, at *11 (S.D.N.Y. Feb. 21, 2024); *see also, Blash v. Comm'r of Soc. Sec. Admin.*, 813 F. App'x 642, 644 (2d Cir. 2020) ("The ALJ is obligated to consider "'all of the relevant medical and other evidence.'" *Genier v. Astrue*, 606 F.3d 46, 50 (2d Cir. 2010) (quoting 20 C.F.R. § 404.1545(a)(3)).   An ALJ's failure

to consider relevant evidence is grounds for remand. *See id.*; *see also Kohler v. Astrue*, 546 F.3d 260, 268-69 (2d Cir. 2008) (concluding that ALJ erred by tending to "overlook or mischaracterize" portions of evidence that supported disability finding).").

And, of course, an ALJ is not permitted to "cherry pick" evidence that supports his RFC finding. *See, Bohart v. Astrue*, No. 10-CV-6503, 2011 WL 2516413, at *5 (W.D.N.Y. June 23, 2011) ("An ALJ cannot selectively choose the only portions of a medical opinion that support his determination, while ignoring others.") (citations omitted).

> Cherry-picking can be defined as "inappropriately crediting evidence that supports administrative conclusions while disregarding differing evidence from the same source." *Artinian v. Berryhill*, No. 16-cv-4404 (ADS), 2018 WL 401186, at *8 (E.D.N.Y. Jan. 12, 2018). Cherry-picking can "indicate a serious misreading of evidence, failure to comply with the requirement that all evidence be taken into account, or both." *Id.* (quoting *Younes v. Colvin*, No. 1:14-cv-170, 2015 WL 1524417, at *8 (N.D.N.Y. Apr. 2, 2015)). But an allegation of cherry-picking is "seldom successful because crediting it would require a court to re-weigh record evidence." *DeLong v. Comm'r of Soc. Sec.*, 748 F.3d 723, 726 (6th Cir. 2014). Indeed, what a claimant may label as cherry-picking can often be described "more neutrally as weighing the evidence." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009).

*Lisa T. v. Kijakazi*, No. 3:20-CV-1764 (SVN), 2022 WL 2207613, at *3 (D. Conn. June 21, 2022).[15]   Certainly, however, remand may be appropriate where a plaintiff demonstrates that

---

[15] *See also, Estrella v. Berryhill*, 925 F.3d 90, 97 (2d Cir. 2019) (Observing that some impairments, such as depression, may have symptoms that wax and wane, and that, "in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working. *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014); *see also Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008) ("A person who has a chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days.... Suppose that half the time she is well enough that she could work, and half the time she is not. Then she could not hold down a full-time job."). When viewed alongside the evidence of the apparently cyclical nature of Estrella's depression, the ALJ's two cherry-picked treatment notes do not provide 'good reasons' for minimizing Dr. Dron's opinion.").

an ALJ engaged in cherry picking or otherwise mischaracterized evidence. *See, Jackson v. Kijakazi*, 588 F. Supp. 3d 558, 585 (S.D.N.Y. 2022) ("Courts frequently remand an ALJ's decision when it ignores or mischaracterizes medical evidence or cherry-picks evidence that supports his RFC determination while ignoring other evidence to the contrary."); *Vanessa N. v. Comm'r of Soc. Sec.*, No. 1:23-CV-00913 EAW, 2024 WL 4131242, at *3 (W.D.N.Y. Sept. 9, 2024) ("Courts frequently remand an ALJ's decision when it ignores or mischaracterizes medical evidence or cherry-picks evidence that supports his RFC determination while ignoring other evidence to the contrary.").

Applying these principles, the Court finds that Plaintiff's arguments on this point lack merit, and that the ALJ did not commit reversible error when evaluating Jack's opinions.   Instead, the Court finds that Plaintiff's arguments on this point amount to a disagreement with how the ALJ weighed the evidence. *See, Lisa M. o/b/o J.S. v. Comm'r of Soc. Sec.*, No. 1:21-CV-00292 EAW, 2023 WL 3943997, at *3 (W.D.N.Y. June 12, 2023) ("A disagreement with how the ALJ weighed the evidence is not a valid basis to challenge the ALJ's determination.").

For example, although it is perfectly acceptable for a medical provider to base a mental diagnosis on a patient's subjective complaints,[16]  it was appropriate for the ALJ to consider, when evaluating the supportability and consistency of Jack's opinions, that such opinions appeared to be based heavily on Plaintiff's own descriptions of his symptoms, which were not consistent with

---

[16]  *See, e.g., Girao v. Kijakazi*, No. 22-CV-1419 (JLC), 2023 WL 5312064, at *16 (S.D.N.Y. Aug. 18, 2023) ("As a general matter, consideration of a patient's report of complaints, or history, as an essential diagnostic tool, is a medically acceptable clinical and laboratory diagnostic technique, and, in the case of mental impairments, there is nothing amiss about an acceptable medical source relying on subjective symptoms to form a diagnosis.") (internal quotation marks omitted, collecting cases).

many of Jack's own reported observations or the findings of other examiners, such as Dr. Brownfeld. *See, e.g., Andrew S. v. Comm'r of Soc. Sec.*, No. 21-CV-6565MWP, 2024 WL 989705, at *7 (W.D.N.Y. Mar. 7, 2024) ("[C]ontrary to plaintiff's contention, the ALJ properly assessed the supportability of Dr. Boulduc's opinion when he found that she "offered limited explanation for [her] opinion, or reference to objective findings" and that she "appear[ed] to rely primarily on the claimant's subjective complaints.  . . .  Plaintiff complains that the ALJ "rejected [Dr. Boulduc's] opinion after concluding it was based on subjective complaints" but "gives nothing to say how this is the case." (Docket # 9-1 at 15). To the contrary, the ALJ explained that Dr. Boulduc "offered limited explanation for this opinion, or reference to objective findings.  *As such*, it appears to rely primarily on the claimant's subjective complaints." (Tr. 24 (emphasis added)). In any event, as stated above, the decision does not indicate that the ALJ rejected Dr. Boulduc's or any other opinion based solely on the fact that it relied on subjective complaints. *See Horne v. Comm'r of Soc. Sec.*, 2020 WL 5044218, *3 (W.D.N.Y. 2020) (rejecting plaintiff's challenge that the ALJ failed to explain how his subjective complaints were inconsistent with the record because the ALJ explained how the "complaints of disabling symptoms were not consistent with the objective findings").")") (emphasis in original).

The Court also finds no merit to Plaintiff's contention that the ALJ erred by failing to acknowledge that the Easterseals treatment notes actually supported Jack's very-restrictive functional assessment.  Plaintiff contends, for example, that the Easterseals notes show that Plaintiff's anxiety was so bad that he was unable to leave his house. *See*, Pl. Memo of Law, ECF No. 6-1 at p. 22 ("[T]he evidence from Easterseals was consistent with the mental opinions.  . . . .  The undersigned notes that all of [the] follow-ups [with Easterseals therapists] occurred by

telehealth, meaning that Plaintiff did not have to leave his house."). In fact, however, the Easterseals notes refer to Plaintiff leaving his house to do a variety of things, such as visiting family members, getting a tattoo, and attending a show at a comedy club. Tr. 1983. Indeed, Plaintiff reported that he enjoyed himself at the comedy show, despite feeling that his anxiety was "a little high." Tr. 1893.

Neither does the Court agree with Plaintiff that the ALJ ignored or misrepresented the findings of Dr. Saar, insofar as he found that such findings were inconsistent with Dr. Jack's opinion. For example, Saar, who tested Plaintiff over the course of two days, reported that Plaintiff was polite, expressed himself well, had no difficulty understanding instructions, and had normal focus and attention. Saar stated that testing showed only mild anxiety, and only mild-to-moderate depression. Tr.1982, 1983. Saar further noted that Plaintiff's own description of his depressive symptoms seemed exaggerated, stating: "A depression self-report measure suggests severe symptoms. However, this is not congruent with [his] presentation and the results need to be interpreted with caution." Tr. 1982. Saar did note that emotional factors sometimes caused Plaintiff to give up too easily and not maintain effort. Tr. 1981. However, as the ALJ mentioned, Saar also cautioned that Plaintiff might not have given full effort on the testing, stating:

> Embedded validity measures are variable, while a formal test of malingering strongly indicates inadequate effort. [David's] effort and motivation significantly fluctuate throughout the course of the assessment, and this impacted some of the results. Due to [David's] inadequate effort, these results very likely underestimate his functioning ins some areas and need to be interpreted with caution.

Tr. 1981 (emphasis added). Saar further observed that Plaintiff was initially not entirely forthcoming about the circumstances under which his prior employment ended, stating:

37

> [David] has had multiple different jobs with many of them being in security.   He
> was employed at Wegmans for 11 years.   He last worked in May of 2018.   [David]
> states that he hasn't sought employment since that time because he doesn't work
> well with others.   He also expresses that working significantly increases his stress
> level and anxiety.   Per [David], he gets fired from every job he has because of his
> behavior and his actions.   He states that he often had trouble getting along with
> co-workers.   *Upon further questioning, he explains that he quit several jobs and
> sometimes was frustrated that he wasn't moving up.*

Tr. 1980 (emphasis added).

Indeed, contrary even to what he told Saar, Plaintiff testified at his first hearing that he

quit more than one of his security jobs to pursue better opportunities, and that his employment

was *not* imperiled by an inability to get along with others:

Q. Tell me about the security jobs.   How did they end?

A. The security jobs ended on my own.   I left because of different opportunities
[INAUDIBLE]

Q. Okay.   You found a better job.   Is that why you left?

A. Yes, sir.

Q. And that was true for both of them?

A. Yes, sir.

Q. Okay, So, you didn't have any issues getting along with your coworkers or your
supervisors at the two security places?

A. I did have issues, Sir. [INAUDIBLE]   yes, I did.

Q. Okay, you had issues, but you –

A. [INAUDIBLE].

38

Q. Okay.   But they didn't imperil your job.   You were able to keep working?

A. Yes.

Tr. 234.

To the extent the Court has not specifically addressed other arguments by Plaintiff, the Court similarly finds them to be without merit.

## CONCLUSION

For the reasons discussed above, Plaintiff's motion (ECF No. 6) for judgment on the pleadings is denied, Defendant's cross-motion (ECF No. 8) for the same relief is granted, and this action is dismissed.   The Clerk is directed to enter judgment for Defendant and to close this action.

So Ordered.

Dated: Rochester, New York               ENTER:
      September 30, 2024

CHARLES J. SIRAGUSA
United States District Judge